UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL P. HOLMES,                              Case No. 12-11625

       Plaintiff,                              Honorable Arthur J. Tarnow
                                                       Senior United States District Judge
v.

ANGELA T. HOLMES.

       Defendant.
_____/

## ORDER DENYING PLAINTIFF'S PETITION [1]

Michael P. Holmes (Mr. Holmes) brings a Complaint and Petition [1] under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) as implemented by the United States in the International Child Abduction Remedies Act, 42 U.S.C. 11601 *et seq.* (1995) (ICARA). Plaintiff alleges that his wife, Defendant Angela T. Holmes (Ms. Holmes), wrongfully removed their child from Ireland and asks the Court to return the child. Because the Court finds that the child had no habitual residence at the time of the removal, Mr. Holmes was not exercising custody at the time of the child's removal, and the child would face grave risk of harm if returned to Ireland, the Court denies Mr. Holmes' Petition.

    Background

Plaintiff Michael Holmes is a citizen and resident of the Republic of Ireland. Defendant Angela T. Holmes is a citizen and resident of the United States. Mr. Holmes and Ms. Holmes are the parents of a daughter.

1

Mr. Holmes and Ms. Holmes married in the United States on February 9, 2011–about a month and a half after meeting for the first time. About a month after the couple married, they found out they were pregnant. The couple decided that they would move to Ireland, largely based on the fact that Ms. Holmes had no health insurance in the United States and would receive healthcare benefits in Ireland.[1] Their daughter was born on December 11, 2011 in Ireland.

On February 6, 2012, at Defendant Angela Holmes' request, the Irish police were called. She reported spousal abuse. A nurse and social worker took Ms. Holmes and child to a safe house in Ireland. On February 15, 2012, Ms. Holmes brought the child to the United States without Mr. Holmes' permission. The facts regarding the couple's marriage and relationship are in dispute. Mr. Holmes and Ms. Holmes submitted testimony at a three-day evidentiary hearing before this Court. Because the parties are familiar with the facts and testimony, they will only be discussed as needed throughout this opinion.

Discussion

The Hague Convention proposes "to secure the prompt return of a child wrongfully removed to or retained in any Contracting State." *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (internal quotation and citation omitted). The Hague Convention defines a wrongful removal as a removal where:

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

---

[1] The parties dispute whether the move to Ireland was intended to be long-term or short-term. This issue is discussed below.

2

19 I.L.M. 1501, Art. 3.

The parties dispute both aspects of the wrongful removal test: 1) whether the child was a habitual resident of Ireland and 2) whether Mr. Holmes was actually exercising custody at the time of the removal. Mr. Holmes has the burden of showing by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1).

If Mr. Holmes meets his burden of showing that the removal was wrongful, then the burden shifts to Ms. Holmes who may raise an affirmative defense to defeat the return of the child. *Stevens v. Stevens*, 499 F. Supp. 2d 891, 895 (E.D. Mich. 2007). Article 13 of the Hague Convention provides an affirmative defense for a parent who is found to have wrongfully removed his or her child. Article 13 states that a child will not be returned if "there is a grave risk that the return of the child would expose the child to physical or psychological harm–proven by clear and convincing evidence." 19 I.L.M. 1501, Art. 13.

*Habitual Residence*

Mr. Holmes has not shown that Ireland was the child's habitual residence by a preponderance of the evidence. The determination of a child's habitual residence is a mixed question of law and fact. *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995); *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001).

> [A] child's habitual residence is the place where . . . she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. . . . [A] determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Feder*, 63 F.3d at 224.

Here, the child was only two-months-old when she was removed from Ireland. The child

3

is still nursing. The couple's infant, two-month-old, child did not acquire a habitual residence in Ireland before her mother relocated her to the United States. *See Delvoye v. Lee*, 329 F.3d 330, 332 (3d Cir. 2003) (finding that a two-month-old infant, who is still nursing, has not been present long enough to have an acclimatization apart from his parents). Because the child is too young to have acclimated itself to its surroundings, the Court considers the intentions of the parents as factors in determining whether there was a habitual residence for the child. The evidence does not support a finding that Ireland was the intended long-term residence of the parents.

It is undisputed that the couple moved to Ireland to receive healthcare for the mother and child during birth. It is also undisputed that neither the mother or the father had a job in Ireland. They did not own a home in Ireland. They were renting a place to live, and the lease was to end in June. They essentially had no family support in Ireland because Mr. Holmes is estranged from his family. This was admitted by Mr. Holmes and also supported by his brother's testimony and Ms. Holmes' testimony. The couple did, however, receive financial support and emotional support from Ms. Holmes' family in the United States.

The parties disagree as to their intent to stay in Ireland long-term. Mr. Holmes maintains that they only agreed to move to Ireland temporarily and had planned on moving back to the United States. Ms. Holmes testified that they discussed moving back but the discussion was simply a possibility and not set in stone. Mr. Holmes' own testimony and Skype conversation transcript supports this notion–that the couple was not committed to staying in Ireland.

Also supporting the claim that the move was not permanent is the fact that Mr. Holmes left behind tools in the United States that he used for his trade. If they intended on moving permanently, it does not seem likely that he would have left behind tools needed to make a living. The couple also

4

completed a Petition for Alien Relative, I-130, from the U.S. Citizen and Immigration Services. Although it was never submitted, this application shows that the couple was not necessarily committed to staying in Ireland long-term. They had been in Ireland for less than a year and were already filling out paperwork to return to the United States.

Finally, Ms. Holmes' assertion was supported by her own testimony, which the Court finds to be credible. The Court finds that the evidence presented in the form of testimony and exhibits support Ms. Holmes' assertion that the move to Ireland was temporary. Therefore, the Court finds that the child did not have a habitual residence in Ireland.

*Actually Exercising Custody*

A "wrongful removal" generally occurs when the child is taken from a person who was in actual custody of the child at the moment of the removal. *Id.* Mr. Holmes has also failed to show, by a preponderance of the evidence, that he was exercising actual custody at the moment of the child's removal.

It is undisputed that Irish law enforcement officials and social workers were called to the couple's home twice due to Ms. Holmes' allegations of domestic violence, which the Court finds credible. On February 6, 2012, a social worker and a nurse arrived at the couple's home after Ms. Holmes requested protection from Mr. Holmes' alleged abuse. Ms. Holmes and child were taken to a safe house in Ireland, away from Mr. Holmes. During the time in the safe house, Ms. Holmes and child had no contact with Mr. Holmes.

Ms. Holmes testified that she was advised by the American Embassy and the Irish officials that if she filed for custody in Ireland, she would not be able to leave until the case was decided. Since Ms. Holmes had no support in Ireland, she chose to file for an emergency passport and take

the child to safety in the United States. The Court finds that at the time of the removal, Mr. Holmes was not actually exercising custody over the child. Therefore, he has not met his burden under the Hague Convention for the child to be returned.

*Grave Risk of Harm*

Even if Mr. Holmes had met his burden of showing that the removal of the child was wrongful under the Hague Convention, the Court finds that a removal from the United States would have been precluded by a grave risk of harm to the child if returned to Ireland.

The Court's conclusions are largely based on the testimony and evidence produced at the three-day evidentiary hearing. Specifically, the Court finds Ms. Holmes and her witnesses credible. Mr. Holmes testified as the only witness on his behalf. The Court finds little credibility in Mr. Holmes' testimony.

The evidence and testimony supports Ms. Holmes' allegations of abuse. Each witness, other than Mr. Holmes, provided consistent testimony that Mr. Holmes tends to be controlling, obsessive, and angry. When drinking alcohol, Mr. Holmes becomes impulsive, violent, and unstable.

The Court found Ms. Holmes' testimony to be the most influential and credible. Ms. Holmes shared that she had been abused and controlled by Mr. Holmes. She testified that she was isolated, threatened, physically harmed, and emotionally harmed by Mr. Holmes. Polly Gumina, Ms. Holmes' mother, testified and supported the allegations. For example, it is undisputed that while in Ireland, when Ms. Holmes' mother was visiting, Mr. Holmes locked himself, Ms. Holmes, and the child in a bedroom for at least twenty hours straight. Mr. Holmes claims that he kept his wife and child in the room with him for twenty hours so that his mother-in-law, who flew in from the United States, could have privacy in their home. Ms. Gumina, however, testified that she repeatedly

knocked on the door to ask for food and for a match to light the fireplace so she could warm herself. The Court finds that the testimony supports Ms. Holmes' allegation that she was held hostage in the room by Mr. Holmes, not that it was done to give Ms. Gumina privacy.

Testimony by Robert Pizzimenti, D.C., supports Ms. Holmes' allegations. Dr. Pizzimenti runs a facility in Detroit. He knows both parties. Mr. Holmes visited his facility and then also began working with Dr. Pizzimenti, doing natural building. Dr. Pizzimenti testified that he witnessed Mr. Holmes threaten multiple people at his facility. He testified that he observed extreme mood swings by Mr. Holmes and that he would get loud and physical in a rebellious way. The Court finds Dr. Pizzimenti's testimony to be credible and that it is evidence of the grave risk the child would face if returned to Ireland.

Also testifying in favor of Ms. Holmes was Dennis Wright, by telephone from Ireland, a friend of Mr. Holmes' and the godfather of the child. Wright testified that although he is friends with Mr. Holmes, he felt it was his duty, as the godfather of the child, to testify that the child would be at grave risk of harm if returned to Ireland. Wright gave examples of his experiences with the couple, the child, and their former family pet. Wright testified that the child was unusually quiet around men, a possible sign of fear. He testified that the couple's former dog seemed to be especially frightened of men, consistent with Ms. Holmes' testimony that Mr. Holmes had abused the dog. He also testified that Mr. Holmes was very uneasy about leaving Ms. Holmes alone with Wright's wife, signifying his controlling behavior. Finally, Wright described Mr. Holmes to be "obsessive," which is consistent with Ms. Holmes' position that he was obsessive with her and controlling of her. The Court finds Wright's testimony to be credible.

Mr. Holmes' brother, William Holmes (William), also testified by telephone from Australia.

He testified that Mr. Holmes has a history of abusive behavior and that the child would be in grave risk of harm if returned to Ireland. William testified that Mr. Holmes had been abused as a child and involved in the criminal justice system. Mr. Holmes does not dispute those facts. William also testified that Mr. Holmes had been abusive to him in the past. The Court finds William's testimony to be credible. Even in the few moments that William was testifying, Mr. Holmes' demeanor changed drastically. Mr. Holmes became very angry and insulting to his brother. While the Court understands that this case involves emotionally charged issues, Mr. Holmes exhibited the exact behavior that was described by the witnesses.

It is also important to note that Mr. Holmes is currently in law enforcement custody. Even if the Court were to rule in his favor, he would not be able to care for the child. While he claims that he is scheduled to voluntarily depart the country, there is no evidence that he will be able to pay for a flight to return to Ireland. Furthermore, the circumstances of Mr. Holmes' detention are also evidence of the type of harm that the child would face if returned to Ireland. Mr. Holmes tried to enter the United States to find a lawyer and attend the hearing in this case. When he was denied entry to the United States, he chose to cross into the country illegally from Canada. The Court finds this impulsive, illegal activity to be further evidence of Mr. Holmes' state of mind and the grave risk of harm that would be faced by the child if returned to Ireland.

The Court finds the testimony and evidence presented by Ms. Holmes to establish by clear and convincing evidence that the child would be in grave risk of harm if returned to Ireland. Because Mr. Holmes has failed to meet his burden in showing that the removal of the child was wrongful and because Ms. Holmes has met her burden in showing that the child would be at grave risk of harm if returned to Ireland, the Court denies Plaintiff's Petition.

Accordingly,

IT IS ORDERED that Plaintiff's Petition [1] is DENIED.

IT IS SO ORDERED.

                                                s/Arthur J. Tarnow
                                                Arthur J. Tarnow
                                                Senior United States District Judge

Dated: 8/23/2012